**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | | |
|---|---|---|---|
| SOUTHEASTERN PENNSYLVANIA | : | | |
| TRANSPORTATION AUTHORITY, | : | | |
| | : | CIVIL ACTION | |
| Plaintiff, | : | | |
| | : | | |
| v. | : | NO. 07-2919 | |
| | : | | |
| CAREMARKPCS HEALTH, L.P., | : | | |
| | : | | |
| Defendant. | : | | |

## MEMORANDUM AND OPINION

L. FELIPE RESTREPO                                      DECEMBER 9, 2008
UNITED STATES MAGISTRATE JUDGE

Before the Court is Defendant CaremarkPCS Health, L.P.'s ("Caremark") Memorandum

of Law (Doc. No. 105) objecting to the production of certain documents pursuant to the attorney-

client privilege.  See Def.'s Mem. 1.  Caremark's in-house attorney that worked on the contract at

issue in this litigation, Sara Hankins, Esquire, has submitted an affidavit in support of

Defendant's position. (Doc. No. 110).  See Hankins Aff. ¶ 4.  Caremark maintains that all

communications at issue were "authored for the primary purpose of both obtaining and providing

legal advice relative to the contract," and that all individuals involved in the communications

were "directly involved in at least some aspect of the negotiation or finalization of the SEPTA

contract."  Def.'s Mem. 2, 5-6.

Plaintiff Southeastern Transportation Authority's ("SEPTA") Letter Memorandum (Doc.

No. 106) argues that the documents are not privileged.  See Pl.'s Mem. 1.  SEPTA seeks

production of e-mail strings, memoranda, and draft documents sent between those Caremark

employees who worked on the SEPTA account and contract negotiations and Caremark's in-

house counsel and paralegal responsible for providing legal advice on the SEPTA contract.[1]  See Def.'s Amended Supp. Priv. Log.  SEPTA argues that the "primary purpose" of these communications between business personnel and in-house legal staff was to obtain business advice, not legal advice and contends that in some cases, any potential privilege was waived because the documents were too widely disseminated.  See Pl.'s Mem. 3-4, 6-8, 10, 12-13.

The Court finds that Caremark has satisfied its burden of proving that the documents are covered by the attorney-client privilege and need not be produced.  The Court has reviewed these documents *in camera*, and will explain the application of the attorney-client privilege to each document below.[2]

## I. DISCUSSION

"Pennsylvania privilege law governs this dispute because the underlying action arises under Pennsylvania law."  Santer, 2008 U.S. Dist. LEXIS 23364, at *2 (citing Fed. R. Evid. 501; Montgomery County v. Microvote Corp., 175 F.3d 296, 301 (3d Cir. 1999)).  In Pennsylvania, the following elements must be met in order for a party to successfully assert the attorney-client privilege:

> (1) the asserted holder of the privilege is or sought to become a client;
> (2) the person to whom the communication was made (a) is a member

---

[1]The Court must take special caution not to discuss the specific content of the documents in detail, otherwise "the very purposes of [*in camera*] review" would be subverted, creating a risk that "the privilege will be destroyed."  In re: Ford Motor Co., 110 F.3d 954, 966 n.11 (3d Cir. 1997); see also Faloney v. Wachovia Bank, N.A., 2008 WL 2631360, at *3 n. 3 (E.D. Pa. June 25, 2008).

[2]The Third Circuit has recognized that "*in camera* review is the appropriate method for resolving privilege disputes."  Santer v. Teachers Ins. & Annuity Ass'n, 2008 U.S. Dist. LEXIS 23364, at *3-4 n.1 (E.D. Pa. Mar. 24, 2008) (citing United Coal Cos. v. Powell Constr. Co., 839 F.2d 958, 966 (3d Cir. 1988)).

> of the bar of a court, or his or her subordinate, and (b) in connection
> with this communication is acting as a lawyer; (3) the communication
> relates to a fact of which the attorney was informed (a) by his client
> (b) without the presence of strangers (c) for the purpose of securing
> primarily either (i) an opinion of law or (ii) legal services or (iii)
> assistance in some legal proceeding, and (d) not for the purpose of
> committing a crime or tort; and (4) the privilege has been (a) claimed
> and (b) not waived by the client.

Santer, 2008 U.S. Dist. LEXIS 23364, at *2 (quoting Rhone-Poulenc Rorer v. Home Indem. Co., 32 F.3d 851, 862 (3d Cir. 1994)).  The two disputed issues in the present case are whether the contested communications were made primarily to secure legal advice and whether the privilege was waived with respect to certain documents.  See e.g., Pl.'s Mem. 1, 6, 8.

The attorney-client privilege has historically been applied only to "communications from a client to an attorney," but "Pennsylvania courts have . . . developed a corollary doctrine covering communications from an attorney to a client when such communications reflect the communications from the client to the attorney."  Santer, 2008 U.S. Dist. LEXIS 23364, at *4-5 n.3 (citations omitted); see also Ford, 110 F.3d at 965 ("the entire discussion between a client and an attorney undertaken to secure legal advice is privileged, no matter whether the client or the attorney is speaking.").  Communications with the subordinate of an attorney, such as a paralegal, are also protected by the attorney-client privilege so long as the subordinate is "acting as the agent of a duly qualified attorney under circumstances that would otherwise be sufficient to invoke the privilege."  Dabney v. Investment Corp. of America, 82 F.R.D. 464, 465 (E.D. Pa. 1979) (citing 8 Wigmore, Evidence § 2301 (McNaughton Rev. 1961)).

The fact that the client is a corporation does not vitiate the attorney-client privilege.  Kramer v. Raymond Corp., 1992 U.S. Dist. LEXIS 7418, at *2-3 (E.D. Pa. May 26, 1992) (citing

Upjohn Co. v. United States, 449 U.S. 383, 389-90 (1981)).  "[T]he privilege applies to communications by a corporate employee concerning matters within the scope of his duties purposefully made to enable an attorney to provide legal advice to the corporation."  AAMCO Transmissions, Inc. v. Marino, 1991 U.S. Dist. LEXIS 13326, at *8 (E.D. Pa. Sept. 23, 1991) (citing Upjohn, 449 U.S. 383; Admiral Ins. Co. v. United States Dist. Court, 881 F.2d 1486, 1492 (9th Cir. 1989)).  "Likewise, it is clear that the privilege may apply where the communication is to in-house counsel rather than to outside counsel retained for a particular matter."  Kramer, 1992 U.S. Dist. LEXIS 7418, at *3 (citing Upjohn, 449 U.S. at 394-95).  The "primary purpose" of the communication at issue must be "to gain or provide legal assistance" for the privilege to apply due to the fact that "in-house counsel may play a dual role of legal advisor and business advisor."  Kramer, 1992 U.S. Dist. LEXIS 7418, at *3.  In this regard, the Third Circuit has held that even when "the decision include[s] consideration of" various business concerns, the attorney-client privilege still applies to the communications if the decision "was infused with legal concerns and was reached only after securing legal advice."  Faloney, 2008 WL 2631360, at *5 (quoting Ford, 110 F.3d at 966).

"[T]he 'scope of an individual's employment is . . . highly relevant to the question of maintenance of confidentiality.'"  Smithkline Beecham Corp. v. Apotex Corp., 232 F.R.D. 467, 476 (E.D. Pa. 2005) (quoting Smithkline Beecham Corp. v. Apotex Corp., 193 F.R.D. 530, 539 (N.D. Ill. 2000)).  "The communications retain their privileged status if they [sic] information is relayed to other employees of officers of the corporation on a need to know basis."  Andritz Sprout-Bauer, Inc. v. Beazer East, Inc., 174 F.R.D. 609, 633 (M.D. Pa. 1997).  As such, "[t]he 'privilege is waived if the communications are disclosed to employees who did not need access

4

to' them."  Smithkline, 232 F.R.D. at 476 (quoting Baxter Travenol Lab. v. Abbott Lab., 1987

U.S. Dist. LEXIS 10300, at *14 (N.D. Ill. June 17, 1987)); see also Andritz, 174 F.R.D. at 633

("Only when the communications are relayed to those who do not need the information to carry

out their work or make effective decisions on the part of the company is the privilege lost."

(citing In re Grand Jury 90-1, 758 F. Supp. 1411 (D. Colo. 1991))).

It is important to note that the attorney-client privilege usually protects "the

communications themselves."  Andritz, 174 F.R.D. at 633.  However, "[d]ocuments sent to or

prepared by counsel incorporating such information for the purpose of obtaining or giving legal

advice, planning trial strategy, etc. are protected from compelled disclosure[,]" but "[t]o the

extent that purely factual material can be extracted from privileged documents without divulging

privileged communications, such information is obtainable."  Id.  Additionally,

> [d]rafts of documents prepared by counsel or circulated to counsel for
> comments on legal issues are considered privileged if they were
> prepared or circulated for the purpose of giving or obtaining legal
> advice and contain information or comments not included in the final
> version.  Allegheny Ludlum Corp. v. Nippon Steel Corp., 1991 U.S.
> Dist. LEXIS 5173, 1991 WL 61144 at *5 (E.D. Pa. Apr. 15, 1991).
> **"Preliminary drafts of contracts are generally protected by
> attorney/client privilege, since '[they] may reflect not only client
> confidences, but also legal advice and opinions of attorneys, all of
> which is protected by the attorney/client privilege.'"** Muller v.
> Walt Disney Productions, 871 F. Supp. 678, 682 (S.D.N.Y. 1994),
> quoting Schenet v. Anderson, 678 F. Supp. 1280, 1284 (E.D. Mich.
> 1988).   See also:  Upsher-Smith Laboratories, Inc. v. Mylan
> Laboratories, Inc., 944 F. Supp. 1411, 1444-45.  Compare: United
> States Postal Service v. Phelps Dodge Refining Corp., 852 F. Supp.
> 156, 163 (E.D.N.Y. 1994).

Id. (emphasis added).

"A document need not be authored or addressed to an attorney in order to be properly

withheld on attorney-client privilege grounds." Smithkline, 232 F.R.D. at 477 (quoting Santrade, Ltd. v. General Elec. Co., 150 F.R.D. 539, 545 (E.D. N.C. 1993)).  When the client is a corporation, "privileged communications may be shared by non-attorney employees in order to relay information requested by attorneys."  Smithkline, 232 F.R.D. at 477 (citing Santrade, 150 F.R.D. at 545).  Additionally, "documents subject to the privilege may be transmitted between non-attorneys . . . so that the corporation may be properly informed of legal advice and act appropriately."  Smithkline, 232 F.R.D. at 477 (quoting Santrade, 150 F.R.D. at 545). Furthermore, the privilege may also extend to certain "documents, [that] while not involving employees assisting counsel, still reflect confidential communications between client and counsel or subordinates of counsel for the purpose of either (1) providing legal services or (2) providing information to counsel to secure legal services."  Smithkline, 232 F.R.D. at 477 (citing Cuno, Inc. v. Pall Corp., 121 F.R.D. 198, 202 (E.D.N.Y. 1988)).

        However, the "attorney-client 'privilege does not shield documents merely because they were transferred to or routed through an attorney.'"  Smithkline, 232 F.R.D. at 478 (quoting Resolution Trust Corp. v. Diamond, 773 F. Supp. 597, 600 (S.D.N.Y. 1991)).  "What would otherwise be routine, non-privileged communications between corporate officers or employees transacting the general business of the company do not attain privileged status solely because in-house or outside counsel is 'copied in' on correspondence or memoranda."  Smithkline, 232 F.R.D. at 478 (quoting Andritz, 174 F.R.D. at 633).  Therefore, in order to successfully assert the attorney-client privilege, the corporation "must clearly demonstrate that the communication in question was made for the express purpose of securing legal not business advice."  Marino, 1991 U.S. Dist. LEXIS 13326, at *9 (citing Teltron, Inc. v. Alexander, 132 F.R.D. 394, 396 (E.D. Pa.

1990); Avianca, Inc. v. Corriea, 705 F. Supp. 666, 676 (D.D.C. 1989)).

The party asserting the attorney-client privilege "bears the burden of proving that it

applies to the communication at issue." Sampson v. Sch. Dist. of Lancaster, 2008 WL 4822023,

at *3 (E.D. Pa. Nov. 5, 2008) (citing In re Grand Jury Empaneled Feb. 14, 1978, 603 F.2d 469,

474 (3d Cir. 1979)).  It is important for the party seeking to assert the privilege to "identify [a]

specific attorney with whom a confidential communication was made" in order to satisfy this

burden.  Smithkline, 232 F.R.D. at 477 (citing United States v. Construction Prods. Research,

Inc., 73 F.3d 464, 473 (2d Cir. 1996)).  Other relevant considerations are whether the party has

specifically identified all recipients of the document, and whether the document was "widely

distributed."  Smithkline, 232 F.R.D. at 478 ("The recipient lists were limited to between five

and twenty-five individuals within a 50,000-person organization.").

In the present case, Sara Hankins, Esquire, has submitted an affidavit asserting that she

was employed as Senior Legal Counsel at Caremark at the time the contested communications

were made.  See Hankins Aff. ¶ 4.  She acted as "the principal in-house lawyer advising

Caremark[] and its business representatives on the SEPTA contract, and the legal issues

surrounding such contract" during that time frame.  Id.  Further, Ms. Hankins asserts that Joy

Kershaw was a paralegal who acted as her subordinate, assisted with the SEPTA contract, and

"was responsible for implementing the changes to the draft contract once [Ms. Hankins] had

approved them."  Id. ¶ 5.  Ms. Hankins declares that she and Ms. Kershaw "worked on the

contract in a strictly legal capacity."  Id. ¶ 6.  Bearing the above legal principles in mind, the

Court will address the discoverability of each document separately.

**A. DOCUMENTS 225**

Document 225 is a string of e-mails that was produced to SEPTA with one exception; namely, Caremark redacted some proposed contract language from an e-mail sent from Ms. Kershaw to Allison Brown, the Associate Vice President in the Underwriting Group.  Hankins Aff. ¶ 8.  The four individuals carbon copied (hereinafter "CC'd") on the e-mail are Colette Millstone, the SEPTA account executive; Samantha Brown, in-house counsel for Caremark; Ms. Hankins; and Dan Parrish, one of Caremark's pharmacy network specialists.  Id.  Ms. Hankins asserts that she directed Ms. Kershaw to "convey legal advice by way of setting forth revised proposed contract language for consideration by the Caremark[] employees directly involved in the SEPTA contract negotiations, and to seek feedback from both business people and legal personnel regarding the proposed legal contract language."  Id.  SEPTA argues that it appears that Ms. Kershaw is merely discussing prices that would be offered to SEPTA rather than conveying legal advice.  See Pl.'s Mem. 3.

After careful *in camera* review of this document, it is clear that Ms. Kershaw authored the redacted e-mail to relay legal advice and to seek additional guidance on particular contract terms from both legal and business personnel; as such, the document is privileged.  Andritz, 174 F.R.D. at 633 (citing Muller, 871 F. Supp. at 682) ("[p]reliminary drafts of contracts are generally protected by attorney/client privilege . . . ."); see also Smithkline, 232 F.R.D. at 477 (citing Cuno, 121 F.R.D. at 202) (the privilege may extend to certain "documents, [that] while not involving employees assisting counsel, still reflect confidential communications between client and counsel or subordinates of counsel for the purpose of either (1) providing legal services or (2) providing information to counsel to secure legal services.").  To require disclosure of this document would

reveal client communications and legal advice that were incorporated into the proposed contract language.  Furthermore, Ms. Hankins has asserted that she and Ms. Kershaw played solely a legal role in relation to the SEPTA contract.  Hankins Aff. ¶ 6.  Even if business concerns were at issue in the communications, as SEPTA suggests, it is clear that any business decisions were only being made after securing legal advice from Ms. Hankins and Ms. Kershaw concerning the contract language.  See Faloney, 2008 WL 2631360, at *5 (quoting Ford, 110 F.3d at 966).  Therefore, the "primary purpose" of the communications was to relay legal advice, not business advice.  See Kramer, 1992 U.S. Dist. LEXIS 7418, at *3.  The fact that Ms. Kershaw authored the e-mail does not destroy the privilege because she was acting as the agent of Ms. Hankins under circumstances where the attorney-client privilege applies.  See Dabney, 82 F.R.D. at 465; see also Hankins Aff. ¶¶ 5, 8.

The e-mail was sent to those that needed to stay informed. Three of the individuals involved in the communication were members of Caremark's in-house legal staff and the other three individuals were those who were intimately involved with the SEPTA contract negotiation and formation.  Because this e-mail was not widely disseminated and was only sent to individuals who had a "need to know" the legal advice, Caremark has satisfied its burden of establishing that the privilege has not been waived.  See Smithkline, 232 F.R.D. at 476, 478 (quoting Baxter, 1987 U.S. Dist. LEXIS 10300, at *14); see also Andritz, 174 F.R.D. at 633.

## B. DOCUMENT 486

Document 486 is a string of e-mails which begins with the same e-mail that was redacted in-part in Document 225.  Hankins Aff. ¶ 8.  SEPTA argues that the communications merely

reveal which pharmacy networks would be offered to SEPTA.  Pl.'s Mem. 3.  This string of e-mails contains the same redaction as that in Document 225.  Hankins Aff. ¶ 8.  The only difference is that in this string of e-mails, in addition to those personnel listed above, this information was also sent to Barbara Pollio, who was Ms. Brown's subordinate in the Underwriting Department.  See Def.'s Mem. Ex. A (filed under seal).

As stated above, these communications are privileged because they contain legal advice regarding proposed contract language.  Andritz, 174 F.R.D. at 633 (citing Muller, 871 F. Supp. at 682); see also Smithkline, 232 F.R.D. at 477 (citing Cuno, 121 F.R.D. at 202).  Regardless of whether business concerns were intertwined in the communications, the primary purpose of the communications was clearly to provide legal advice to businesspeople regarding the contract language.  See Faloney, 2008 WL 2631360, at *5 (quoting Ford, 110 F.3d at 966); see also Kramer, 1992 U.S. Dist. LEXIS 7418, at *3.  Since Ms. Kershaw was acting as the agent of Ms. Hankins when she sent the contested e-mail, the privilege is not lost.  See Dabney, 82 F.R.D. at 465; see also Hankins Aff. ¶¶ 5, 8.  Finally, since this e-mail was not widely disseminated and was only sent to individuals who had a "need to know" the legal advice, Caremark has established that the privilege was not waived.  See Smithkline, 232 F.R.D. at 476, 478 (quoting Baxter, 1987 U.S. Dist. LEXIS 10300, at *14); see also Andritz, 174 F.R.D. at 633.

## C. DOCUMENT 237

Document 237 contains four e-mails, two of which are redacted.  The first redacted e-mail was sent by Ms. Millstone, the SEPTA account executive, to Scott Bond, Vice President of Sales, and Sara Sullivan, who was Ms. Millstone's Supervisor.  Hankins Aff. ¶ 9.  Ms. Hankins

and Ms. Kershaw are CC'd on the e-mail.  Id.  The next redacted e-mail was sent from Mr. Bond

to Ms. Millstone and Ms. Hankins, with Ms. Kershaw and Ms. Sullivan CC'd on the e-mail.  Id.

SEPTA argues that Ms. Hankins is merely a recipient of these e-mails and that "there is

no evidence of any communication let alone legal advice flowing from attorney Hankins."  Pl.'s

Mem. 5 (quoting In re Vioxx Prods. Liab. Litig., 501 F. Supp. 2d 789, 809 (E.D. La. 2007))

("When e-mail messages were addressed to both lawyers and non-lawyers for review, comment,

and approval, we concluded that the primary purpose of such communications was not to obtain

legal assistance since the same was being sought from all.").[3]

---

[3]SEPTA relies heavily on Vioxx throughout its letter memorandum.  See e.g., Pl.'s Mem. 2-3, 5, 6, 8, 9, 12.  Not only is Vioxx not controlling law in this jurisdiction, but there are reasons to discount its persuasive force.  The Vioxx Court enlisted the assistance of Special Master Paul Rice, a well known scholar in the area of attorney-client privilege, and Special Counsel Brent Barriere to resolve a number of attorney-client privilege disputes.  Vioxx, 501 F. Supp. 2d at 791-92.  In Vioxx, as Caremark points out, two major privilege disputes dealt with a "pervasive regulation" theory and a "reverse engineering" theory.  Id. at 800-805; see also Def.'s Mem. 1 n. 1.  Under the "pervasive regulation" theory, Merck attempted to assert the attorney-client privilege with respect to certain documents on the basis that due to the heavy regulation of the drug industry, almost all activities of drug companies "carr[y] potential legal problems vis-a-vis government regulators."  Id. at 800.  The Special Master rejected this theory, noting that it "would effectively immunize most of the industry's internal communications because most drug companies are probably structured like Merck where virtually every communication leaving the company has to go through the legal department for review, comment, and approval."  Id. at 801.  The Special Master also noted that, while pervasive regulation "is a factor that must be taken into account when assessing" the application of the attorney-client privilege to communications with in-house counsel, the party asserting the privilege must still satisfy its "burden of persuasion on the elements of attorney-client privilege" with respect to each document.  Id. at 800-801.  Under the "reverse engineering" theory, Merck unsuccessfully argued that even if things such as "studies" and "proposals," not normally privileged, were attached to communications, they should be privileged because "adversaries can discern the content of the legal advice that was subsequently offered."  Id. at 804-05.  In the present case, the communications at issue clearly involve negotiation of the SEPTA contract and its formation.  See Hankins Aff. ¶¶ 7-15; Def.'s Mem. 1-2 n.1.  Because the factual scenarios and arguments being advanced in the present case are distinguishable from those in Vioxx, the Court is hesitant to rely on the Vioxx case as persuasive authority.

Ms. Hankins asserts that the first e-mail does in fact reveal legal advice that she gave concerning the SEPTA contract and calls for input from Mr. Bond.  Hankins Aff. ¶ 9.  With regard to the second e-mail, Ms. Hankins asserts that Mr. Bond responded and provided her with feedback "regarding specific contractual terms and strategy for contract negotiations."  Id.

After careful *in camera* review of the contested e-mails, the Court finds that Caremark has met its burden of establishing that the attorney-client privilege applies.    Here, it is evident that business people involved with the SEPTA account and contract were communicating with each other, and Ms. Hankins, to relay legal advice and to seek additional guidance on particular contract terms; as such, the documents are privileged even though they are not authored by an attorney.  See Smithkline, 232 F.R.D. at 477 (quoting Santrade, 150 F.R.D. at 545). Furthermore, the privilege also applies because these documents reveal confidential legal communications between Ms. Hankins and her corporate clients.  See Smithkline, 232 F.R.D. at 477 (citing Cuno, 121 F.R.D. at 202).

Absent specific evidence to the contrary, the Court finds that Ms. Hankins' affidavit proclaiming that the contested e-mails reveal her legal advice to her clients is sufficient to establish that they were privileged, regardless of whether or not she was the sender.  See RCN Corp. v. Paramount Pavilion Group LLC, 2003 U.S. Dist. LEXIS 24004, at *9-10 (E.D. Pa. Dec. 19, 2003) (holding that in-house counsel's affidavit that he was only involved in the communications in his legal capacity was sufficient to establish privilege when the opposing party merely accused him of acting in a business capacity in its brief (citing Georgine v. Amchem Prods., Inc., 160 F.R.D. 478, 485 n. 3 (E.D. Pa. 1995); Meridian Mortgage Corp. v. Spivak, 1992 U.S. Dist. LEXIS 12319, 1992 WL 205640, at *3 (E.D. Pa. Aug. 14, 1992))); see also

12

Smithkline, 232 F.R.D. at 477 (quoting Santrade, 150 F.R.D. at 545) ("A document need not be authored or addressed to an attorney in order to be properly withheld on attorney-client privilege grounds."). Furthermore, because Caremark has established that these e-mails were only sent to employees that were involved with the SEPTA account and contract, and thus needed to stay informed of the legal advice, the privilege was not waived. See Smithkline, 232 F.R.D. at 476 (quoting Baxter, 1987 U.S. Dist. LEXIS 10300, at *14); see also Andritz, 174 F.R.D. at 633.


### D. DOCUMENT 480

Document 480 contains an e-mail with a cut-and-pasted excerpt from a memorandum that was written by Ms. Hankins and addressed to David George, Caremark's President, with Susan de Mars, Caremark's General Counsel, and Joe Filipek, Caremark's Executive Vice President of Client Management CC'd on the memorandum. Hankins Aff. ¶ 10. Ms. Hankins notes that the complete version of this memorandum was also sent to Mr. Bond and Ms. Millstone. Id. In the e-mail, Mr. Bond sends an excerpt of the memorandum to Andrew Thomas, Ms. Millstone's supervisor, Ms. Millstone, and Ms. Brown. Id. ¶ 11. Ms. Hankins notes that "the primary purpose of this memorandum was to set forth my legal analysis of the proposed SEPTA contract." Id. ¶ 10. Ms. Hankins asserts that all individuals that received the memorandum "needed to know what [her] advice was with respect to the contract at issue." Id. ¶¶ 10-11.

SEPTA contends that this memorandum "was disseminated to non-legal employees for the purposes of analyzing a business decision and further it was disseminated without regard to whether the underlying communication contained privileged legal advice," partially because the document does not state on its face that it contains legal advice and must be kept confidential.

Pl.'s Mem. 5-6.  Caremark argues that these communications reveal Ms. Hankins' legal advice only to those on a "need to know" basis and that the mere fact that the document is not "labeled 'privileged'" does not vitiate the privilege.  Def.'s Mem. 8-9 (citing Lifewise Master Funding v. Telebank, 206 F.R.D. 298, 301 (D. Utah 2002)) (citations omitted).

The excerpted memorandum clearly reveals the legal advice of Ms. Hankins.  Further, Mr. Bond's e-mail disseminating the excerpted memorandum clearly demonstrates that the purpose of this further dissemination is for the purpose of relaying the Ms. Hankins' legal advice contained in the memorandum.  The privilege applies because these documents reveal confidential legal communications between Ms. Hankins and her corporate clients.  See Smithkline, 232 F.R.D. at 477 (citing Cuno, 121 F.R.D. at 202).  Further, the privilege applies because the purpose of disseminating the memorandum was "so that the corporation may be properly informed of legal advice and act appropriately."  Smithkline, 232 F.R.D. at 477 (quoting Santrade, 150 F.R.D. at 545).  As the memorandum was only disseminated to those corporate employees in a "need to know" position, the privilege was not waived.  See Smithkline, 232 F.R.D. at 476 (quoting Baxter, 1987 U.S. Dist. LEXIS 10300, at *14); see also Andritz, 174 F.R.D. at 633.  Moreover, the mere fact that business concerns may have motivated the communication at issue does not render the documents unprivileged because the Court finds that any business decisions being made were "infused with legal concerns and [were] reached only after securing legal advice."  Faloney, 2008 WL 2631360, at *5 (quoting Ford, 110 F.3d at 966).

Caremark persuasively argues that its failure to specifically label Ms. Hankins' memorandum as "confidential" or "privileged" does not destroy the privilege.  Communications are confidential "if 'not intended to be disclosed to third persons other than those to whom

disclosure is in furtherance of the rendition of professional legal services.'" <u>Faloney</u>, 2008 WL 2631360, at *5 (quoting <u>United States v. Moscony</u>, 927 F.2d 742, 752 (3d Cir. 1991)).  The <u>Faloney</u> court held that communications were confidential even though an employee discussed them with other employees of the Defendant and even though the communications were not labeled as "confidential," because "the information was not public knowledge."  <u>Faloney</u>, 2008 WL 2631360, at *6 (citing <u>In re U.S. Healthcare, Inc. Sec. Litig.</u>, 1989 WL 11068, at *2 n. 2 (E.D. Pa. Feb. 8, 1989); <u>Moscony</u>, 927 F.2d at 752).  Further, the communications were held to be confidential because "[t]he conveyed information was within the scope of [the employees] employment," and it had been established that the employees knew that the attorneys needed the information in order to render legal advice.  <u>Faloney</u> 2008 WL 2631360, at *7.

Similarly, in the present case, all employees involved in the discussion surrounding the disputed memorandum were acting within the scope of their employment on the SEPTA contract. <u>See</u> Hankins Aff. ¶¶ 10-11.  Furthermore, the portion of the e-mail that was produced is clear on its face that, while Mr. Bond originally thought the concerns were merely business decisions, the legal issues outlined in the memorandum were of consequence to the businesspeople involved in the communications.  There is no evidence to indicate that the information contained in the memorandum was public knowledge or that it was disseminated to other employees that were not acting in the scope of their employment; as such, the fact that the memorandum was not labeled "confidential" or accompanied by instructions not to disclose, does not render it discoverable. <u>See</u> <u>Faloney</u>, 2008 WL 2631360, at *5-7 (citations omitted).

### E. DOCUMENT 481

Document 481 consists of four e-mails, the first of which was redacted by Caremark.  The redacted e-mail is authored by Ms. Allison Brown, "senior underwriter of the SEPTA contract," and is sent to Ms. Hankins.  Hankins Aff. ¶ 12.  Becky Hedberg, one of Ms. Brown's subordinates, and Ren Elder, "senior executive in the networks group," Ms. Kershaw, and Ms. Millstone are all CC'd on the e-mail.  Id.  Ms. Hankins declares that, in the e-mail, "Ms. Brown advises [her] and the SEPTA business team about a contract term, and apprises [them] of the status of the contract negotiations."  Id.  Ms. Hankins asserts that she needed to be kept abreast of this type of information in order to render her legal advice on the contract.  Id.  Subsequent e-mails in the chain reveal that this information was also shared with Mr. Bond, Andrew Thomas, who took over as Ms. Millstone's supervisor at some point, and Margaret Wear, who is "Vice President, Chief Actuary."  Id.; see also Def.'s Mem. Ex. A (filed under seal).

Caremark argues that this e-mail should be privileged because it involves Ms. Brown "advis[ing] in-house counsel and the SEPTA business team about a new contract term and the reasons for resisting same, and appris[ing] them of the status of the contract negotiations."  Def.'s Mem. 9 (citing American Nat'l Bank and Trust Co. of Chicago v. AXA Client Solutions, LLC, 2002 WL 1058776, at *4 (N.D. Ill. Mar. 22, 2002) (finding e-mail "correspondence with counsel regarding contract language on market timing" amongst in-house counsel and employees to be protected by the attorney-client privilege)).  In response, SEPTA argues that Caremark has failed to establish that Ms. Brown was seeking legal advice from Ms. Hankins in the original e-mail and further argues that the privilege was waived because the e-mail was disseminated to other non-lawyer Caremark employees.  Pl.'s Mem. 8 (citing Vioxx, 501 F. Supp. 2d at 812).

It is clear that the primary purpose of the redacted e-mail was to keep Ms. Hankins informed on the contract terms at issue and the status of contract negotiations so that she could render effective legal advice.  Thus, Caremark has satisfied its burden of proving that the attorney-client privilege applies.  See Kramer, 1992 U.S. Dist. LEXIS 7418, at *3.  The e-mail was subsequently disseminated to other individuals who worked on the SEPTA account and needed to know about the issues with the contract terms and negotiations.  For these reasons, the Court finds that the privilege was not waived.  See Smithkline, 232 F.R.D. at 476, 478 (quoting Baxter, 1987 U.S. Dist. LEXIS 10300, at *14); see also Andritz, 174 F.R.D. at 633.

### F. DOCUMENT 485

Document 485 consists of an e-mail string of which four e-mails have been redacted by Caremark.  Hankins Aff. ¶ 13.  In the first e-mail, which was produced, Ms. Millstone asks Ms. Kershaw to forward a copy of the document discussed above in Document 225.  After Ms. Kershaw does so, Ms. Millstone then drafts an e-mail, which was redacted, that is addressed to Ms. Kershaw, Ms. Brown, Mr. Elder, and Ms. Hankins.  Id.  Mr. Bond and Ms. Sullivan are CC'd on the e-mail.  Id.  Ms. Hankins states that the e-mail seeks legal advice from her regarding "proposed changes to the contract."  Id.  In the next redacted e-mail, Ms. Brown addresses Ms. Millstone regarding to the issues raised in the first e-mail.  Id.  The e-mail is addressed to Ms. Millstone, with Ms. Kershaw, Mr. Elder, Ms. Hedberg, Ms. Hankins, Ms. Sullivan, and Mr. Bond CC'd on the e-mail.  See Def.'s Am. Supp. Priv. Log.  Ms. Hankins asserts that the purpose of this e-mail was to "impart information to [her] for the purpose of seeking legal advice." Hankins Aff. ¶ 13.  Two e-mails follow, both of which were produced; in both e-mails, Ms.

17

Kershaw and Ms. Millstone contact each other regarding how to proceed.

The next redacted e-mail is from Ms. Kershaw to Ms. Millstone, with Ms. Brown, Ms. Hedberg, Ms. Hankins, Ms. Samantha Brown, another in-house lawyer at Caremark, and Cheryl Hall, Manager of Pricing, all CC'd on the e-mail.  Id.; see also Def.'s Mem. Ex. A.  Ms. Hankins asserts that this e-mail "both provides and directions from the Legal Department as well as seeking legal advice from one of her attorney supervisors."  Hankins Aff. ¶ 13.  This e-mail contains a red-lined "version of the referenced contract," which will be addressed separately.  Id. The final redacted e-mail is from Ms. Allison Brown to Ms. Kershaw with CC's to Ms. Hedberg, Ms. Millstone, Ms. Samantha Brown, Ms. Hankins, Ms. Hall, Mr. Elder, and Colleen Currie, a subordinate of Mr. Elder.  See Def.'s Am. Supp. Priv. Log; Def.'s Mem. Ex. A.  Ms. Hankins asserts that in this e-mail, Ms. Brown responds to Ms. Kershaw's e-mail regarding the contract language and "discusses contract negotiation strategy."  Hankins Aff. ¶ 13.

Six e-mails follow, all of which were produced, that contain correspondence between Ms. Millstone, Ms. Brown, Ms. Pollio, and Mr. Elder.  A redacted e-mail follows, which contains the same document that was withheld pursuant to the e-mail string in Document 225.  Hankins Aff. ¶ 8.  Subsequent e-mails in the chain reveal this document and discussions related thereto between Ms. Brown, Mr. Parrish, Ms. Pollio, and Mr. Elder.  These e-mails were produced.  Ms. Hankins declares that "[t]he redacted portions of this string were drafted with the primary purpose of seeking legal advice and also revealed my legal advice."  Id. ¶ 13.  Caremark asserts that these communications were made to seek advice from both counsel and businesspeople concerning the pricing exhibit to the contract.  Def.'s Mem. 10.  It argues that the privilege applies to both the information communicated to the attorney and the advice the attorney has given.  Id. at 11 (citing

18

Santrade, Ltd., 150 F.R.D. at 545; Faloney, 2008 WL 2631360, at *5).  Caremark also contends

that even if the communications contained business-related concerns, the privilege should not be

vitiated.  Def.'s Mem. 11 (citing Faloney, 2008 WL 2631360, at *5; Ford, 110 F.3d at 966).

SEPTA argues that Caremark has not satisfied its burden to prove that all communications

contained in the e-mail string were made for the purpose of securing legal advice and that even if

the documents would be privileged, Caremark's wide dissemination of the information deems the

privilege waived.  Pl.'s Mem. 10.

  The primary purpose of first redacted e-mail is clearly to seek advice concerning the

contract language from both business and legal personnel.  Even if these communications

"include[d] consideration of" various business concerns, the attorney-client privilege still applies

to the communications because they were "infused with legal concerns."  Faloney, 2008 WL

2631360, at *5 (quoting Ford, 110 F.3d at 966).  Furthermore, all business personnel involved in

the communications at issue were within the core group of individuals working on the SEPTA

contract that had a "need to know" the information.  See Smithkline, 232 F.R.D. at 476 (quoting

Baxter, 1987 U.S. Dist. LEXIS 10300, at *14); see also Andritz, 174 F.R.D. at 633.

  It is clear that the second redacted e-mail provides further feedback to both legal and

business personnel regarding the topics discussed in the first redacted e-mail.  The Court has

considered Ms. Hankins' assertion that the purpose of this e-mail was to provide her with

information necessary to render legal advice.  Hankins Aff. ¶ 13.  As a result, the Court finds that

for the same reasons the first e-mail is privileged, the second redacted e-mail is also privileged.

The third e-mail is also privileged because it contains feedback and advice from Caremark's in-

house attorneys and paralegal, and also because in the e-mail, Ms. Kershaw seeks further legal

advice from her supervisors.  see Ford, 110 F.3d at 965 ("the entire discussion between a client and an attorney undertaken to secure legal advice is privileged, no matter whether the client or the attorney is speaking.").

The fourth e-mail is also clearly privileged as it provides Ms. Kershaw with advice about contract terms and negotiations in order for the legal department to provide their legal advice on the contract.  See Smithkline, 232 F.R.D. at 477 (citing Cuno, 121 F.R.D. at 202) (documents that "reflect confidential communications between client and counsel" in order to "provid[e] information to counsel to secure legal services" may be privileged).  Finally, for the reasons discussed above, the cut-and-pasted contract language that Ms. Kershaw e-mailed to both business and legal personnel is privileged.  Because none of the above communications were revealed to individuals outside of the core group of individuals who had a "need to know" of the information, the privilege was not waived.  See Smithkline, 232 F.R.D. at 476 (quoting Baxter, 1987 U.S. Dist. LEXIS 10300, at *14); see also Andritz, 174 F.R.D. at 633.

### G. DOCUMENT 553

Document 553 "is a draft addendum that was proposed to be attached to the SEPTA contract," which was drafted by Ms. Hankins and sent to Ms. Kershaw and Ms. Brown.  Hankins Aff. ¶ 14.  SEPTA requests that the Court determine whether or not it contains legal advice or "non-legal editing or wordsmithing and/or basic comments."  Pl.'s Mem. 12-13.  Ms. Hankins asserts that this addendum "set[s] forth [her] legal advice."  Hankins Aff. ¶ 14.  "Preliminary drafts of contracts are generally protected by attorney/client privilege, since '[they] may reflect not only client confidences, but also legal advice and opinions of attorneys, all of which is

protected by the attorney/client privilege.'" <u>Andritz</u>, 174 F.R.D. at 633 (quoting <u>Muller</u>, 871 F. Supp. at 682 (citations omitted)); <u>see also</u> <u>Smithkline</u>, 232 F.R.D. at 477 (citing <u>Cuno</u>, 121 F.R.D. at 202) (the privilege may also extend to certain "documents, [that] while not involving employees assisting counsel, still reflect confidential communications between client and counsel or subordinates of counsel for the purpose of either (1) providing legal services or (2) providing information to counsel to secure legal services."). The Court is satisfied that Caremark has satisfied its burden of proving that Document 553 is privileged. Since the draft addendum was not widely disseminated and not revealed to employees outside the scope of those who needed to remain informed of Ms. Hankins' legal advice, the privilege was not waived. See <u>Smithkline</u>, 232 F.R.D. at 476, 478 (quoting <u>Baxter</u>, 1987 U.S. Dist. LEXIS 10300, at *14); <u>see also</u> <u>Andritz</u>, 174 F.R.D. at 633.

## H. DOCUMENT 554

Document 554 "is a draft contract that [Ms. Hankins] directed Ms. Kershaw to prepare and revise." Hankins Aff. ¶ 15. Ms. Hankins declares that it "sets forth legal advice and incorporated confidential communications from [her] clients that were directly involved in the finalization of the SEPTA contract." <u>Id.</u> This draft contract was disseminated to Cyndi Street, a subordinate of Ms. Allison Brown, Ms. Brown herself, and Ms. Millstone. Def.'s Mem. 12; <u>see also</u> Def.'s Mem. Ex. A. Copied on this document are Patrick O'Neal, the client rebates manager, Michael Satre, a subordinate of Mr. O'Neal, Michael Caley, another subordinate of Mr. O'Neal, Ms. Pollio, Amy Companik, a subordinate of Ms. Brown, and Bonnie Stone, a subordinate of Margaret Wear. Def.'s Mem. 12; <u>see also</u> Def.'s Mem. Ex. A.

SEPTA extends its argument concerning Document 553 to the draft contract contained in Document 554.  Pl.'s Mem. 12-13.  After consideration of Ms. Hankins' assertion that this draft contract incorporates her legal advice and confidential communications from clients and the fact that the document was not disseminated amongst employees that were outside the group of individuals who had a "need to know" the information, the Court is again satisfied that the document is privileged and that the privilege has not been waived.  See Andritz, 174 F.R.D. at 633 (quoting Muller, 871 F. Supp. at 682); see also Smithkline, 232 F.R.D. at 476 (quoting Baxter, 1987 U.S. Dist. LEXIS 10300, at *14).

## I. DOCUMENT 555

Document 555 is a red-lined draft contract, which was attached to an e-mail contained in Document 485.  Hankins Aff. ¶ 13.  Ms. Hankins declares that the draft contract contains her legal advice.  Id.  SEPTA extends its arguments concerning Documents 553 and 554 to Document 555.  Pl.'s Mem. 12-13.  This red-lined draft contract unequivocally contains legal advice from Ms. Hankins, leaving no doubt that it is privileged.  Andritz, 174 F.R.D. at 633 (quoting Muller, 871 F. Supp. at 682) ("[p]reliminary drafts of contracts are generally protected by attorney/client privilege . . . ."); see also Smithkline, 232 F.R.D. at 477 (citing Cuno, 121 F.R.D. at 202).  Moreover, because the string of e-mails in Document 485 which contained this red-lined draft contract were only disseminated to those Caremark employees that worked on the SEPTA contract and had a "need to know" of Ms. Hankins' legal advice, the privilege was not waived.  See Smithkline, 232 F.R.D. at 476 (quoting Baxter, 1987 U.S. Dist. LEXIS 10300, at *14); see also Andritz, 174 F.R.D. at 633.

22

## II. CONCLUSION

For the reasons stated above, the Court finds that Caremark has satisfied its burden of proving the contested documents are covered by the attorney-client privilege.  Caremark has also demonstrated that it did not waive the privilege with respect to any of the disputed communications.  Therefore, the Court will not require Caremark to produce Documents 225, 237, 480, 481, 485, 486, 553, 554, nor 555 to SEPTA.  An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **SOUTHEASTERN PENNSYLVANIA** | : | |
| **TRANSPORTATION AUTHORITY,** | : | |
| | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **NO. 07-2919** |
| | : | |
| **CAREMARKPCS HEALTH, L.P.,** | : | |
| | : | |
| **Defendant.** | : | |

# O R D E R

**AND NOW,** this 8th day of December, 2008, upon consideration of the Affidavit of Sara Hankins, Esquire (Doc. No. 110), Caremark's Memorandum of Law (Doc. No. 105), and SEPTA's Letter Memorandum (Doc. No. 106), it is hereby **ORDERED** that Documents 225, 237, 480, 481, 485, 486, 553, 554, and 555 are **PRIVILEGED** and **NEED NOT** be produced.


BY THE COURT:


/s/ L. Felipe Restrepo____
L. Felipe Restrepo
United States Magistrate Judge